UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| VELMA PAYTON, individually and as the surviving mother of Decedent, LOUIS LYEN PAYTON, deceased. | ) ) ) ) | |
|    Plaintiff, | ) ) | |
|    v. | ) ) | |
| CITY OF ST. LOUIS, MISSOURI; | ) ) | Cause No. 4:20-cv-861 |
| DALE GLASS in his Individual and Official Capacities; | ) ) ) | **JURY TRIAL DEMANDED** |
| JEFFREY CARSON in his Individual and Official Capacities; | ) ) ) | |
| PHILANDER HUGHES in his Individual Capacity; | ) ) ) | |
| RYAN BRANSON in his Individual Capacity; | ) ) ) | |
| TANNAKA BOLER in his Individual Capacity; and | ) ) ) | |
| MATTHIAS ARTHUR in his Individual Capacity | ) ) ) ) | |
|    Defendants. | ) | |

**COMPLAINT**

1.     Louis Lyen Payton was a 48-year-old pretrial detainee housed in St. Louis City's Medium Security Institution (hereinafter referred to and more commonly known as "the Workhouse"), when he died of an opioid overdose the night of August 1, 2018. Mr. Payton overdosed in a common room, which correctional officers were or should have been monitoring. Although other detainees immediately came to his assistance, the correctional officers initially

ignored calls for help. Once they finally responded, not one of the correctional staff even approached Mr. Payton to check him for a pulse, let alone provide CPR or other breathing support. The correctional staff did not give Mr. Payton naloxone, an opioid antagonist, because the City and Defendants Glass and Carson made the conscious decision to refuse to allow correctional staff to carry naloxone or be trained in its use. By the time medical staff finally arrived, Mr. Payton had suffered from low and then no oxygen intake for so many minutes that he was past help. Defendants' failures constitute deliberate indifference to Mr. Payton's serious medical needs in violation of the Fourteenth Amendment to the United States Constitution.

## PARTIES

2.     At all times pertinent hereto, the decedent, Louis Lyen Payton, was a citizen of the United States and a resident of the State of Missouri.

3.     Plaintiff, Velma Payton, is a citizen of the United States and a resident of the State of Missouri.

4.     Ms. Payton is the surviving natural mother of Mr. Payton, and brings this action pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and Missouri statutes governing wrongful death actions, sections 537.080, RSMo. 2018, *et seq*.

5.     Defendant City of St. Louis, Missouri is a political and geographic subdivision of the State of Missouri and is organized as a constitutional charter city under Article VI, section 19 of the Missouri Constitution. The City is the public entity responsible for oversight of the Workhouse through the Division of Corrections within the Department of Public Safety.

6.     Corrections Lieutenant Philander Hughes, Corrections Officer Tannaka Boler, Corrections Officer Matthias Arthur, and Corrections Officer Ryan Branson were on duty and responsible for supervision of Mr. Payton's unit the night he passed away. At all times relevant to

the subject matter of this litigation, these Defendants were acting under color of state law in their capacity as corrections officers for the City of St. Louis. Lieutenant Hughes, Officer Arthur, Officer Boler, and Officer Branson all failed to supervise the dormitory to identify obvious medical symptoms of Mr. Payton showing he was in severe distress and, once notified of these symptoms, they failed to take sufficient action to provide him medical care. Defendants Hughes, Arthur, Boler, and Brandon are sued in their individual capacity.

7.    Defendant Jeffrey Carson is the Superintendent of the Workhouse. Defendant Carson enforces the detention of individuals confined at the Workhouse. At all times relevant to the subject matter of this litigation, Defendant Carson was responsible for training and supervising all correctional officers at the Workhouse, for setting jail policy, and for ensuring the health and welfare of all persons detained at the Workhouse.  Defendant Carson is sued in his individual and official capacity.

8.    Defendant Dale Glass is the Commissioner of the St. Louis Division of Corrections. Defendant Glass directs the Division of Corrections and enforces the detention of individuals confined at Workhouse. At all times relevant to the subject matter of this litigation, Defendant Glass was responsible for training and supervising all other Defendants and other employees of the City of St. Louis staffing the Workhouse, for setting jail policy, and for ensuring the health and welfare of all persons detained at Workhouse. Defendant Glass is sued in his individual and official capacity.

9.    At all times relevant to the allegations in this Complaint, Defendants were acting under color of state law.

10.    All of the individual Defendants are persons under § 1983.

3

## JURISDICTION AND VENUE

11.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

12.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

13.     Venue is proper under 28 U.S.C. § 1391(b) because all of the events alleged herein occurred within the State of Missouri and all of the parties were residents of the State at the time of the events giving rise to this litigation.

14.     Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Plaintiff and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

15.     This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

16.     Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## FACTS

17.     On August 1, 2018, Louis Lyen Payton died in the Workhouse. The medical examiner's report of his death certifies that he died of an opioid overdose.

18.     At the time of his death, Mr. Payton had been held in the Workhouse for almost seven months because he was unable to post his bond. At no point did a judge make a finding that Mr. Payton was a danger to the community or a flight risk.

19.     Within the Workhouse, Mr. Payton was housed in Dormitory B with around thirty-eight other detainees. Dormitory B was indirectly supervised, which means correctional officers

were required to monitor the detainees via closed circuit television as well as perform periodic in-person checks of the two rooms.

20.     On August 1, 2018, Correctional Officer Boler, Correctional Officer Arthur, Correctional Officer Branson, and Lieutenant Hughes were on duty monitoring Dorm B.

21.     That evening, Mr. Payton obtained and used fentanyl, an opioid.  Mr. Payton used it in the sleeping quarters, a large open room which correctional staff monitored through video cameras.

22.     Mr. Payton entered the common recreation area of the dorm at around 11:10 pm. At this time Mr. Payton was walking around and joking with other detainees, and he sat down at a table to play cards. Correctional staff also monitored the common room through video cameras.

23.     The correctional officers who were charged with monitoring the surveillance video clearly saw, or should have seen, Mr. Payton rocking back and forth in his chair at 11:19 pm. The officers clearly saw, or should have seen, that less than a minute later, Mr. Payton's head rolled back and his body slumped over.  When he fell over, Mr. Payton was completely unresponsive.

24.     Immediately after, several detainees surrounded an unconscious Mr. Payton and moved him away from the table.

25.     Detainees frantically tried to revive Mr. Payton. An entire group of detainees rubbed ice on Mr. Payton, laid him out across multiple chairs, shook him, and made other attempts to try to revive him. During this time, detainees noticed that Mr. Payton's breathing was ragged and infrequent. He became cold to the touch and his lips and hands began turning blue.

26.     During this time, Lieutenant Hughes and Officers Boler, Branson, and Arthur were supposed to be monitoring Dorm B. Despite the obvious commotion in the dormitory, not one correctional officer entered the dormitory within the key four and a half minutes of obvious

distress. It would have been clear to a reasonable corrections officer that Mr. Payton was suffering from a medical emergency and required immediate attention.

27.     In fact, during these crucial minutes that Mr. Payton was unconscious and barely, if at all, drawing breath, the video monitor showed two correctional officers walking past the window in the common room. Despite an unconscious detainee and a crowd of detainees surrounding him, neither time did the correctional officer enter the room.

28.     During these crucial first minutes, the other detainees also desperately attempted to verbally alert the guards to the emergency.

29.     Detainees shouted and yelled that Mr. Payton was not breathing.  Different detainees banged on the window or went to the doorway, trying to alert the correctional officers that Mr. Payton was in serious trouble and even said "There's a man in here dying!" Specifically, detainees including Brandon Weddle and Jacques Combs told the correctional staff standing in the hallway that Mr. Payton was not breathing, that he needed serious medical help, and even stated that he was dying.

30.     One of the correctional officers in the hallway—on information and belief Officer Boler—stated in response to their shouts for help that dealing with this wasn't his job.

31.      Not until four minutes and forty seconds after Mr. Payton lost consciousness did Lieutenant Hughes and Officers Boler, Arthur, and Branson enter the dormitory.

32.     On information and belief, at least one detainee specifically told correctional officers that Mr. Payton was suffering from an opioid overdose.

33.     Upon entering the dormitory, Officer Boler, Arthur, and Branson, and Lt. Hughes began accusing other detainees of being high and attempted to move the detainees away from Mr. Payton.

34.     Upon entering the room, Defendants Hughes, Boler, Arthur, and Branson stood by for four additional minutes and watched the remaining detainees try to revive Mr. Payton with ice. None of the Defendants approached Mr. Payton. None of the Defendants checked Mr. Payton's pulse. None of the Defendants administered any first aid. None of the Defendants administered CPR. None of the Defendants administered naloxone.

35.     When the nurses from Corizon Medical Services finally arrived, almost nine minutes after Mr. Payton had become unresponsive, they immediately put Mr. Payton to the ground. On information and belief, at this point, Mr. Payton had not been breathing for many minutes, and the detainees observed his chest was not moving and his lips were purple.

36.     The nurses immediately began to administer CPR and started Mr. Payton on an AED. When interviewed by the police, the nurse stated the AED showed Mr. Payton's heart was unresponsive.

37.     The nurses present told the police later that the detainees, not officers, reported that Mr. Payton was overdosing. Because of this, the nurses followed this heart intervention with breathing support and naloxone.

38.     Mr. Payton never regained consciousness or began breathing.

39.     At least twenty-five minutes after Mr. Payton began showing symptoms, an ambulance and EMT staff arrived at the Workhouse. The EMT staff took Mr. Payton to Saint Louis University Hospital, where he was pronounced dead.

40.     There was no way for Mr. Payton to have accessed sufficient emergency medical intervention earlier without going through the Workhouse corrections officers.

41.     At the Workhouse, correction officers screen the medical needs of detainees incarcerated at the Workhouse and make decisions about how and when detainees can access medical treatment.

42.     Yet correctional officers at the Workhouse routinely leave dozens of detainees together in dayrooms or pods for long periods of time without routine checks by correctional staff.

43.     Even when available, correctional officers in the Workhouse frequently ignored or delayed responding to requests from detainees for medical treatment.

44.     This leads to detainees housed at the Workhouse experiencing unnecessary harm through preventable health emergencies.

45.     Within the twelve months prior to Mr. Payton's death, the jail staff were aware of a number of detainees overdosing on opioids generally, and fentanyl specifically.

46.     Defendant City was aware that, as a routine part of correctional staff's charge to keep detainees safe, correctional officers would be confronted with detainee overdoses for the following reasons:

   a.   On information and belief, in the year prior to Mr. Payton's fatal overdose, numerous other detainees had suffered from non-fatal overdoses.

   b.   Defendant City was well aware of drug trade between detainees and open and obvious drug use among detainees.

   c.   Defendant City was further aware of an ongoing problem with guards smuggling drugs into the Workhouse as well as being involved in the distribution of fentanyl and other drugs. Jesse Bogan, *Two Former St. Louis Corrections Officers arrested on drug and sex charges*, St. Louis Post-Dispatch (Sept. 3, 2015), https://rb.gy/vrf0zt; Chad Garrison, *St. Louis Jailer Pleads Guilty to Smuggling*

*Drugs into City Justice Center*, Riverfront Times (Aug. 13, 2009), https://rb.gy/hvphkz; Matt Sepic, *Workhouse Guards Indicted for Alleged Drug Sales*, St. Louis Public Radio, https://rb.gy/oouqen; Lauren Trager, *St. Louis Corrections Officer Among 7 Charged in Federal Drug Probe*, KMOV (Sept. 5, 2019), https://rb.gy/hqvii5.

d.  Officials from Defendant City regularly state and discuss proactive measures which need to be taken to deal with Missouri's opioid crisis. *See, e.g., Appearance of Craig Schmid*, STL Live: Opioid Crisis (Aug. 2018), https://www.stlouis-mo.gov/government/departments/health/media/stl-live-opioid-crisis.cfm.

47.     In 2017, community organizations offered to provide overdose education and distribute naloxone to jail staff at no cost to the City of St. Louis.

48.     Although those trainings were provided to Workhouse staff members in 2017, the City cancelled scheduled trainings for staff and correctional officers in 2018. Instead, the City decided to provide opioid and naloxone trainings only to 26 Lieutenants.

49.     Further, the City refused to allow correctional officers or supervisors to carry naloxone, refused training for most staff in how to administer it, and limited staff to calling medical providers in the event of an overdose.

50.     After Mr. Payton died, the staff at the Workhouse refused to release information to his family about why or how he passed away. The Workhouse officials, through the City of St. Louis, put out a press release stating Mr. Payton died of an overdose without informing his family first. His family tried for months to get answers to information about his death without any response or empathy from the Workhouse officials.

## CLAIMS FOR RELIEF

### Count I – 42 U.S.C. § 1983
### Fourteenth Amendment – Failure to Provide Medical Care and Treatment
(Against Defendants Hughes, Boler, Branson, Arthur, Carson, and Glass)

51.     Defendants Hughes, Boler, Branson, and Arthur were deliberately indifferent to Mr. Payton's serious medical needs when they failed to provide or obtain timely medical care for him in violation of his Fourteenth Amendment rights.

52.     At all times, Defendants were acting under color of state law.

53.     As a pretrial detainee, Mr. Payton had a clearly established right under the United States Constitution to be free from this deliberate indifference to his serious medical needs. *Barton v. Taber,* 820 F.3d 958, 966 (8th Cir. 2016).

54.     Deliberate indifference is found when a detainee has an objectively serious medical need and correctional staff have actual knowledge of, but deliberately disregard, such need. *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009); *Farmer v. Brennan,* 511 U.S. 825, 847 (1994).

55.     Mr. Payton was suffering from an objectively serious medical condition.

56.     Mr. Payton was unconscious, unresponsive, and turning blue.  His breathing was ragged, and then slowed to where individuals around him easily could tell he was unable to get oxygen in. Any layperson would easily recognize that those symptoms required a doctor's attention, which, in fact, the other detainees did. *Laganiere v. County of Olmsted*, 772 F.3d 1114, 1116 (8th Cir. 2014) (holding an objectively serious medical need can be defined as when a medical need which is, "so obvious that even a layperson would easily recognize the necessity for a doctor's attention.").

10

57.     Those around Mr. Payton immediately recognized how dire the situation was, frantically called for help from the correctional staff, and attempted to revive Mr. Payton by putting ice on his body. Thus, Mr. Payton was suffering from an objectively serious medical condition.

58.     Defendants Hughes, Boler, Branson, and Arthur were aware of, but disregarded, Mr. Payton's serious medical needs.

59.     Mr. Payton was in an open dormitory, in which correctional officers monitored over forty offenders through a combination of watching surveillance video and doing routine checks. The correctional officers on duty, notably Officers Arthur and Branson, should have been monitoring the surveillance video and thus seen Mr. Payton clearly in distress.

60.     Not only should the correctional staff have been well aware of Mr. Payton's medical emergency due to the supposed surveillance video monitoring, Defendant officers were actually informed of the substantial risk. Almost immediately after Mr. Payton started showing signs of a medical emergency, the other detainees started banging on the windows and yelling to correctional officers for help.

61.     Detainees told the multiple correctional officers standing in the hallway that Mr. Payton was not breathing and that he was dying. In direct response to this, Officer Boler stated that it wasn't his job to deal with Mr. Payton's medical emergency.

62.     Despite being told there was a detainee suffering from a life-threatening emergency, it took the correctional staff almost five minutes to enter the common area to assess Mr. Payton's situation. The correctional staff waited to call for medical until the point at which they entered the room.

63.     Death following opioid overdose is preventable if the person overdosing receives basic life support and there is timely administration of the opioid antagonist naloxone. World

Health Organization, *Information Sheet on Opioid Overdoses* (Aug. 2018), https://rb.gy/m2lcf3. Naloxone will completely reverse the effects of an opioid overdose if administered in time. *Id.*

64.     When a guard delays in obtaining medical care for a detainee, "in the face of information that a reasonable person would know requires action," reasonable measures have not been taken. *Ruark v. Drury*, 21 F.3d 213, 216 (8th Cir. 1994) (quoting *Howell v. Evans*, 922 F.2d 712, 720 n. 7 (11th Cir. 1991)).

65.     Defendants Hughes, Boler, Branson, and Arthur's failure to respond to reports of an unconscious detainee who is not breathing for over five minutes is "obviously inadequate" and therefore constitutes deliberate indifference.  *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2014) (showing deliberate indifference when a medical need was obvious and the officer's response was "obviously inadequate.")

66.     Further, Defendants Hughes, Boler, Branson, and Arthur's actions after they entered the dormitory were also deliberately indifferent. The video of Mr. Payton's death shows that he was unconscious and unresponsive for over four minutes after the guards entered the dormitory. The correctional officers knew Mr. Payton was suffering from an opioid overdose. He was literally turning blue in front of them.

67.     On information and belief, all correctional staff in the City jails are required to be trained in CPR and first aid.

68.     Further, on information and belief, Lieutenant Hughes had previously received specific training on how to recognize signs and symptoms of an overdose and how to provide emergency aid such as administering naloxone and giving breathing support. This training included the provision of mouth guards for safe breathing support.

69.     Despite those facts, not one correctional officer checked Mr. Payton for a pulse. Not one correctional officer checked to see if Mr. Payton was breathing. Not one correctional officer began to perform chest compressions, rescue breathing, or any other part of CPR. No correctional officer attempted to retrieve naloxone for use from medical.  The correctional staff's statements to the police, the statements of other detainees present, and the surveillance video footage all show that no correctional staff provided <u>any</u> medical assistance to Mr. Payton at all during the four minutes between when they entered the dormitory and when the nurses arrived.

70.     By the time the nurses arrived, almost nine minutes after Mr. Payton's medical crisis began, the other detainees observed that his chest was not moving and his lips were purple. The video shows that the nurse *immediately* began chest compressions and attached an AED, showing Mr. Payton likely had no pulse at this point.

71.     Given that Mr. Payton was clearly having a life threatening medical crisis during the four minutes between when the guards entered the dormitory and the nurse arrived, and that correctional officers are trained in both first aid and CPR, the failure to provide either first aid or CPR—or to even check to see if either was necessary—is obviously inadequate and shows deliberate indifference.

72.     Although the nurses administered naloxone and started breathing support, Mr. Payton had been with low or no oxygen for over nine minutes before the nurse could begin to help.

73.     Thus, Defendants Hughes, Arthur, Boler, and Branson were deliberately indifferent to Mr. Payton's serious medical need when they failed to respond to direct information that he was having a medical emergency for over five minutes and then, again, when they failed to provide any first aid or CPR despite the obvious signs that Mr. Payton was having a life threatening emergency.

74.    Defendants Hughes, Arthur, Boler, and Branson did not have access to naloxone when they entered the dormitory.

75.    On information and belief, the Workhouse had been provided naloxone free of charge.

76.    Despite this, Commissioner Glass and Superintendent Carson set a policy that correctional officers were not allowed to carry naloxone or other opioid antagonists, and instead would have to wait for medical staff or other emergency help to respond to a scene.

77.    Commissioner Glass and Superintendent Carson set this policy despite knowing of the multiple instances of opioid overdoses, the widespread problems of officers ignoring requests for medical help, and the chronic understaffing of nurses.

78.    By so doing, Commissioner Glass and Superintended Carson were deliberately indifferent to the acknowledged need for naloxone and breathing support for those overdosing like Mr. Payton by limiting the accessibility of the naloxone so that it could not be provided to detainees within three to five minutes.

79.    As a further direct and proximate result of the conduct of Defendants Hughes, Arthur, Boler, Branson, Glass, and Carson, Mr. Payton was deprived of his right to be free from deliberate indifference to his medical needs under the Fourteenth Amendment of the Constitution of the United States of America and 42 U.S.C. § 1983. Because Mr. Payton lost his life, Mrs. Payton has been deprived of her son's companionship, services, instruction, guidance, counsel and support.

80.    The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Payton such that punitive damages should be awarded to punish

Defendants and to deter them, as well as other similarly situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

81.     Mrs. Payton also seeks an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

### Count II – 42 U.S.C. § 1983
### Municipal Liability under *Monell*
Against Defendant Saint Louis City

82.     Plaintiff hereby incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

83.     Defendant City has a policy of inadequately equipping its correctional staff to respond timely to the opioid crisis. Defendant City further has a policy, practice, or custom of failing to train and supervise its correctional officers with respect to medical emergencies and instances of detainee overdose. These policies, practices, and customs were a cause of Mr. Payton's death. Defendant is therefore culpable for the constitutional violations set forth in Count I, pursuant to *Monell v. N.Y. Dep't of Soc. Svcs*, 436 U.S. 658 (1978).

84.     Mr. Payton's death is a result of the following failures: (1) the policy or practice of refusing to allow correctional officers to carry or administer naloxone, and (2) the failure to ensure the correctional officers were properly trained and supervised to respond immediately to detainee medical emergencies.

85.     Defendant City was aware that the Workhouse had issues with opioid trafficking, that numerous detainees had suffered from non-fatal overdoses, and that as a routine part of correctional staff's charge to keep detainees safe, correctional officers would be confronted with detainee overdoses.

15

86.     To establish the existence of a policy, there must be "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). A plaintiff will prevail by showing that the policy was unconstitutional and that it was "the moving force" behind the harm that he suffered. *Id*.

87.     The policy or custom of preventing correctional staff from being trained in, carrying or using naloxone, and instead requiring staff to wait for the medical unit to provide that medication, led to Mr. Payton's death.

88.     Also within the twelve months prior to Mr. Payton's death, community organizations offered the City leadership free supplies of naloxone and other opioid antagonists, and training for correctional staff on how to spot signs of overdoses and intervene. The leadership, namely Commissioner Glass and Superintendent Carson, refused these resources.

89.     Commissioner Glass and Superintendent Carson specifically were aware of the effectiveness of naloxone and the need for correctional officers to be able to recognize signs of an overdose, respond with basic life support, and know how to use naloxone, as evidenced by their initial decision to work with this community group.

90.     Despite that knowledge, Commissioner Glass and Superintendent Carson chose not allow free training to be provided to most of the Workhouse employees, including correctional officers Hughes, Boler, Branson, and Arthur.

91.     Further, Commissioner Glass and Superintendent Carson set a policy that correctional officers were not allowed to carry naloxone or other opioid antagonists, and instead would have to wait for medical staff or other emergency help to respond to a scene.

92.    Commissioner Glass and Superintendent Carson set these policies despite knowing that a delay in provision of naloxone violates recommended practices in opioid overdose treatment, and that this policy was insufficient to respond to an overdose.

93.    Commissioner Glass and Superintendent Carson further set these policies despite knowing of widespread problems of officers ignoring requests for medical help and chronic understaffing of nurses.

94.    Pursuant to their roles, Commissioner Glass and Superintendent Carson possess final policymaking authority for St. Louis City concerning what actions correctional officers are empowered to take at the Workhouse.

95.    Given the obvious need for opioid education and naloxone training, the City's decision to actually reduce the number of individuals trained and to implement a policy or custom of preventing even those correctional staff who were trained to administer naloxone from doing so, was so likely to lead to the withholding of necessary medical care that the City can reasonably be said to have been deliberately indifferent.

96.    When overdosing, individuals lose the ability to breathe adequately—within three to five minutes without oxygen. This causes brain damage and then death.

97.    The City was deliberately indifferent to the acknowledged need for naloxone and breathing support for those overdosing by so limiting the accessibility of the naloxone that it could not be provided to detainees within three to five minutes.

98.    Given that Mr. Payton was suffering from commonly recognized symptoms of an opioid overdose,[1] that the detainees knew he was suffering from an overdose, that Officer Boler

---

[1] According to the U.S. Centers for Disease Control and Prevention, symptoms of an opioid overdoes include: loss of consciousness; slow, shallow breathing; make choking or gurgling sounds; have a limp body; and pale, blue or cold skin. Center for Disease Control, *Preventing an Opioid Overdose*, https://rb.gy/nvoyuc (last visited June 28, 2020).

and Lt. Hughes began accusing other detainees of being high when they entered the dormitory, and that the nurse told the police that detainees immediately shared with them that Mr. Payton was overdosing, Defendants evidently understood that Mr. Payton was likely to be suffering from an opioid overdose and therefore could have provided naloxone but for Defendants' policy of restricting policy and practices.

99.     By the time the first nurse arrived, approximately nine minutes had passed. While the nurse states that she used naloxone, it was not used until Mr. Payton was already beyond help.

100.     The medical examiner's report shows Mr. Payton died of an opioid overdose. Had Mr. Payton received breathing support and administration of naloxone, the staff would have been able to reverse his opioid overdose.

101.     Had the correctional officers been trained and allowed to carry naloxone, they would have been able to immediately provide it to Mr. Payton.

102.     Thus, but for Commissioner Glass and Superintendent Carson's decision to limit training, refusal to allow Workhouse correctional staff to carry or administer naloxone, and refusal to ensure staff was responsive to detainee medical needs, Mr. Payton would be alive.

103.     Defendant St. Louis City is also liable for its failure to train and supervise Workhouse correctional staff on recognizing and responding to medical emergencies generally.

104.     A city "may be subject to § 1983 liability for inadequate training of its employees that directly causes constitutional injury." *Id.* (*citing City of Canton v. Harris,* 489 U.S. 378, 388 (1989)). A failure to train and supervise claim exists where: (1) the City's practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting them, such that the failure to train or supervise reflects a deliberate or conscious choice by the City; and (3) an alleged deficiency in the training or supervising procedures actually caused the plaintiff's

injury. *B.A.B., Jr. v. Bd. of Educ. of City of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012) (*citing Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010)).

105.    Under the customs, policies, and practices of Defendant City, there was no way for Mr. Payton to access medical services, including emergency medical intervention, without going through corrections officers.

106.    These corrections officers, who were not licensed medical professionals, were provided inadequate training or resources to identify the medical needs or to adequately respond to medical requests of detainees incarcerated at the Workhouse.

107.    Despite this, Defendants City implicitly or explicitly adopted and implemented policies, customs, or practices that included, among other things, allowing these correction officers to screen the medical needs of detainees incarcerated at the Workhouse, and make decisions about how and when detainees could access medical treatment.

108.    The City did not sufficiently train these correctional officers about how to recognize medical emergencies, or how to ensure those detainees experiencing medical emergencies received timely treatment.

109.    Further, through detainee complaints and detainees with escalating health problems, the City was aware that correctional officers at the Workhouse routinely left dozens of detainees together in dayrooms or pods for long periods of time without routine checks by correctional staff.

110.    Correctional officers in the Workhouse frequently ignored requests from detainees for medical treatment, even in cases of emergency, delayed responding to those requests, or withheld access to medical treatment altogether.

111.    On information and belief, the City was aware of this through many detainee complaints about delays in accessing health services and from detainees housed at the Workhouse experiencing unnecessary harm through preventable health emergencies.

112.    On information and belief, correctional officers in the Workhouse face little to no discipline or job consequences for ignoring detainee complaints or detainee medical needs.

113.    This demonstrates deliberate indifference on the part of the City because the need for training and/or supervision of Workhouse correctional officers on the rights of detainees to access medical care is so obvious—and the lack of training and/or supervision of Workhouse correctional officers on the rights of detainees to access medical care was so inadequate—that it was likely to result in violating the rights of detainees such as Mr. Payton.

114.    This failure to sufficiently train and supervise led directly to Mr. Payton's death.

115.    Despite the fact that correctional officers were supposed to be continually watching the detainees through cameras in the dormitory, and despite the fact that detainees quickly notified the guards that Mr. Payton was not breathing and that they thought he was dying, it took the correctional officers nearly four minutes for any jail staff to even enter the room where Mr. Payton lay dying, and those officers offered no assistance when they did.

116.    Had the Defendants properly trained, supervised and disciplined officers for ignoring detainee medical needs in the past, the officers would have promptly responded to reports of Mr. Payton's medical crisis.

117.    These failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Mr. Payton as alleged herein.

118.    As a result of Defendant Glass, Carson, and the City of St. Louis' unconstitutional policies and their failure to train, discipline or supervise correctional officers, Mrs. Payton's son

was deprived of his rights to be free from deliberate indifference to his medical needs in violation

Fourteenth Amendments to the Constitution of the United States and remediable under 42 U.S.C.

§ 1983.

119.    Mrs. Payton also seeks an award of attorney's fees and costs pursuant to 42 U.S.C.

§ 1988.

## Count III
## Wrongful Death Pursuant to 537.080, RSMo 2018
(Against Defendants Hughes, Boler, Branson, Arthur, and St. Louis City)

120.    Plaintiff hereby incorporates by reference each and every allegation contained in

the preceding paragraphs as though fully set forth herein.

121.    Under Missouri law, a plaintiff can establish a wrongful death claim on a theory of

negligence by showing: (1) the defendant owed a duty of care to the decedent; (2) the defendant

breached that duty; (3) the breach was the cause in fact and the proximate cause of his death; and

(4) as a result of the breach, the plaintiff suffered damages." *Heffernan v. Reinhold*, 73 S.W.3d

659, 665 (Mo. App. 2002).

122.    It is well established detainees have a right under the Fourteenth Amendment to

have their serious medical needs attended to, and that jails have the duty to protect detainees from

deliberate indifference to their medical needs. *Luckert v. Dodge County,* 684 F.3d 808, 817 (8th

Cir. 2012). Further, Defendant City of St. Louis also had a statutory duty to care for Mr. Payton's

medical needs. § 221.120.1, RSMo 2018.

123.    The City of St. Louis, as well as its correctional staff—Lieutenant Hughes and

Officers Arthur, Boler and Branson—owed a duty to ensure the safety and security of detainees,

including the duty to provide adequate medical care to Mr. Payton.

124.    As discussed more fully in Counts I-II, and incorporated herein, Defendants breached their duty of care in failing to respond to detainee reports of Mr. Payton's serious medical needs in a timely manner and in failing to provide any first aid or CPR despite the obvious need to do so.

125.    The City breached its duty by eliminating necessary training and implementing policies or practices that prevented Defendants Hughes, Arthur, Boler, and Branson from being able to provide breathing support or naloxone to Mr. Payton in order to save his life.

126.    Further, Mr. Payton's death occurred as a direct and proximate result of the grossly negligent acts because but for the actions of Defendants, Mr. Payton would not have died, and his death was a reasonable and probable consequence of Defendants acts and omissions.

127.    Here, the medical examiner's report shows Mr. Payton died in a public common room of an opioid overdose. It is widely known that in order to prevent a death by opioid overdose, individuals can be given either breathing support or naloxone prior to loss of brain functioning.

128.    By the time the nurse arrived in Mr. Payton's dormitory, Mr. Payton had been without sufficient oxygen for over nine minutes.

129.    But for the failure of Defendants Hughes, Arthur, Boler and Branson to respond to Mr. Payton's medical distress and seek timely aid, Mr. Payton would be alive. It was reasonably foreseeable that delaying response to reports of a detainee who is unable to breathe would result in a preventable death.

130.    Additionally, but for the City's policy or practice of refusing to train Workhouse correctional staff in recognizing and responding to an overdose, and in refusing to allow Workhouse employees to carry or administer naloxone, Mr. Payton would be alive. Further, it was reasonably foreseeable that the City's policy or practice of preventing Workhouse employees from

carrying or administering naloxone would result in a preventable opioid death. Thus, the City's actions were both the direct and proximate cause of Mr. Payton's death.

131.    Defendant Hughes, Arthur, Branson, and Bolers' actions and omissions as described above were done in bad faith and with malice, and constituted a conscious abuse of their powers and duties as correctional officers, such that punitive damages should be awarded to punish Defendants Hughes, Arthur, Branson, and Boler and to deter them, as well as other similarly situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

132.    Furthermore, Defendant City of St. Louis has waived sovereign immunity, in that City of St. Louis has obtained a policy or self-insurance plan which is liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy a judgment in this action.

133.    Namely, Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not-for-profit corporation which is funded, at least in part, by annual payments from the City. On information and belief, the funds are later disbursed by the corporation to pay any and all claims against the City, including claims against City correctional officers relating to violations of constitutional rights.

134.    The coverage provided by the PFPC constitutes insurance or, in the alternative, a self-insurance plan, for purposes of section 537.610, RSMo.

135.    As a direct and proximate result of the actions of all Defendants described above and pursuant to section 537.090, RSMo, Ms. Payton has damages as follows: pecuniary loss suffered by reason of the death of Mr. Payton; funeral expenses; and a reasonable value of the

services, consortium, companionship, comfort, instruction, guidance, counsel, training, and the support of which Plaintiff has been deprived by reason of the death of Mr. Payton.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Velma Payton prays that this Court enter an Order in its favor and award compensation for all losses and damages including but not limited to:

a. Actual economic damages as established at trial;

b. Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

c. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

d. Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

1. Issuance of a formal written apology from each Defendant to Plaintiff;

2. The imposition of policy changes designed to avoid future similar misconduct by Defendants;

3. Mandatory training designed to avoid future similar misconduct by Defendants;

e. Pre-judgment and post-judgment interest at the highest lawful rate;

f. Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law; and

g. All appropriate relief at law and equity that justice requires.

Dated:  June 29, 2020                          Respectfully submitted,

                                               By: _/s/ *Maureen Hanlon*__

                                                   Blake A. Strode (MBE #68422MO)
                                                   Jacqueline Kutnik-Bauder (MBE #45014MO)
                                                   Maureen Hanlon (MBE #70990MO)
                                                   ARCHCITY DEFENDERS, INC.
                                                   440 North 4th Street, Suite 390
                                                   Saint Louis, MO 63102
                                                   Tel: (855) 724-2489
                                                   Fax: (314) 925-1307
                                                   bstrode@archcitydefenders.org
                                                   jkutnikbauder@archcitydefenders.org
                                                   mhanlon@archcitydefenders.org