UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JANICE WASHINGTON, as personal | ) | |
| Representative of the estate of | ) | |
| VELMA PAYTON,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-861-SEP |
| | ) | |
| CITY OF ST. LOUIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM & ORDER

Before the Court is Defendants' Motion for Summary Judgment.[2] Doc. [10]. The Motion is fully briefed. For the reasons set forth below, the Motion is denied as to Count I against Defendants Hughes, Brandon, and Arthur; granted as to Count I against Defendants Glass and Carson; and granted as to Count III against Defendant City of St. Louis.

### BACKGROUND

Plaintiff Janice Washington brings this action as personal representative of the estate of Velma Payton, the mother of decedent, Louis Payton, who died of an opioid overdose on August 1, 2018,[3] while detained at St. Louis City's Medium Security Institution (MSI). Doc. [1] ¶ 1. Her Complaint asserts claims against Dale Glass, Commissioner of the St. Louis Division of

---

[1] The original Plaintiff in this action, Velma Payton, passed away on November 23, 2020. Doc. [51] ¶ 1. Pursuant to Federal Rule of Civil Procedure 25(a), Plaintiff Janice Washington was substituted for Velma Payton. Doc. [56].

[2] Defendants moved for summary judgment on all of Plaintiff's claims, Doc. [10], and the Court granted the motion in part and denied it in part, *see* Doc. [40]. The Court granted the motion with respect to Count I against Defendants Carson and Glass in their official capacities. *Id.* at 10. The Court further required that Plaintiff respond to: (1) the individual Defendants' legal arguments for summary judgment on the basis of qualified immunity, and (2) the City's argument for summary judgment as to Count III on the basis of sovereign immunity. *Id.* In all other respects, the motion was denied. Thus, the only issues for the Court to resolve in this Order are whether qualified immunity shields individual Defendants from Count I and whether sovereign immunity shields the City of St. Louis from Count III.

[3] The Complaint states that Mr. Payton died "the night of August 1, 2018," Doc. [1] ¶ 1, but the Defendants allege that the death occurred shortly after midnight on August 2, 2018. Doc. [10] ¶ 1 n.1. The discrepancy is immaterial for purposes of this Order.

Corrections, and Jeffrey Carson, Superintendent of the MSI, in their individual and official capacities; Corrections Lieutenant Philander Hughes, and Corrections Officers Ryan Branson and Matthias Arthur, in their individual capacities; and the City of St. Louis.[4]  *See* Doc. [1].

On August 1 and 2, 2018, Mr. Payton was an inmate at MSI housed in Dorm B.  *Id.* ¶¶ 1, 19.[5]  On the evening of August 1, 2018, Payton obtained and used fentanyl in the sleeping quarters, which correctional staff monitored through video cameras.  *Id.* ¶ 21.  Later in the evening, Payton allegedly entered the common area of Dorm B, also referred to as the day room, which was also monitored through video cameras by correctional staff.  *Id.* ¶ 22.

At 11:19 PM, Mr. Payton began rocking back and forth in his chair, and less than a minute later, his "head rolled back and his body slumped over."  *Id.* ¶ 23.  Other detainees attempted to revive Mr. Payton, noticing that his breathing was "ragged and infrequent" and that he became cold to touch and his lips and hands turned blue.  *Id.* ¶¶ 24, 25.  According to Plaintiff, during the time that the other detainees were assisting Mr. Payton, none of the Defendants entered the common area of Dorm B, despite the detainees attempting to notify Defendants of the emergency.  *Id.* ¶ 26.  Two correctional officers walked past the window in the common room where the detainees were surrounding Mr. Payton and causing a commotion, and still neither officer entered the room, despite the detainees shouting that Payton was not breathing, that a man was dying in the room, and that he needed medical attention.  *Id.* ¶¶ 27-29.

Plaintiff alleges that Defendants did not enter the room until four minutes and forty seconds after Mr. Payton lost consciousness.  *Id.* ¶ 31.  At that time, instead of tending to Mr. Payton, Defendants watched as the detainees attempted to revive him with ice.  *Id.* ¶ 34.  Minutes later, on-staff nurses arrived and began administering CPR and started Payton on an automated external defibrillator, which showed that his heart was unresponsive.  *Id.* ¶¶ 35, 36.  The nurses also provided Plaintiff with breathing support and naloxone upon being informed by the detainees that Mr. Payton had overdosed.  *Id.* ¶ 37.  Once an ambulance and EMT staff arrived at

---

[4] Defendants Hughes, Branson, and Arthur will be referenced collectively as "Correctional Officer Defendants."  The suit originally included an additional correctional officer, Tannaka Boler, *see* Doc. [1] at 10, who is deceased and terminated from this case.

[5] Plaintiff does not respond to ¶¶ 1-24 of Defendants' Statement of Uncontroverted Material Facts because the Court required Plaintiff to respond to only that portion of the qualified immunity analysis that Defendants contended did not require the Court to rely on the as-yet-undeveloped factual record.  *See* Doc. [40] at 8.  Thus, the Court relies on the parties' Statements of Uncontroverted Material Facts, Docs. [12], [58], [60], only in considering the City's sovereign immunity defense.

the facility, Mr. Payton was taken to St. Louis University Hospital where he was pronounced dead. *Id.* ¶ 39.

On August 26, 2020, Defendants moved for summary judgment on all counts. Doc. [10]. Plaintiff responded to the motion for summary judgment with a motion pursuant to Federal Rule of Civil Procedure 56(d), asserting that she could not adequately oppose the motion for summary judgment without discovery. Doc. [20].  On review of those motions, the Court granted summary judgment as to Count I against Defendants Carson and Glass in their official capacities and ordered Plaintiff to respond to:  (1) the Defendants' qualified immunity arguments that did not require the resolution of factual disputes, and (2) Defendants' argument for summary judgment as to Count III against the City on the basis of sovereign immunity.  Doc. [40] at 10. The motion for summary judgment was denied in all other respects.  *Id.*  Therefore, the only issues before the Court at this time are whether the individual defendants are entitled to qualified immunity as to Count I, and whether the City is entitled to sovereign immunity as to Count III.

## Legal Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008)).

Motions for summary judgment in qualified immunity cases are "unique in that the court should not deny summary judgment any time a material issue of fact remains on the constitutional violation claim . . . ." *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012)

3

(quoting *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 671 (8th Cir. 2007)) (cleaned up).  Because qualified immunity "is an immunity from suit rather than a mere defense to liability[,] . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).  Therefore, in a qualified immunity case, "the court must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party so long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them."  *Id.* at 1161-62 (quoting *O'Neil v. City of Iowa City, Iowa*, 496 F.3d 915, 917 (8th Cir. 2007)) (cleaned up).

## DISCUSSION

I.     <u>Defendants Hughes, Branson, and Arthur are not entitled to qualified immunity;<br>Defendants Glass and Carson are.</u>

Defendants argue that all five individual Defendants are entitled to summary judgment on the basis of qualified immunity.  Doc. [11-1] at 12.  "Qualified immunity shields government officials from liability in a § 1983 action unless their conduct violates a clearly established right of which a reasonable official would have known."  *Burnikel v. Fong*, 886 F.3d 706, 709 (8th Cir. 2018) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Thus, a "[q]ualified immunity analysis requires a two-step inquiry:  (1) whether the facts shown by the plaintiffs make out a violation of a constitutional or statutory right, and (2) whether the right was clearly established at the time of the defendant's alleged misconduct."  *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (quoting *Nord v. Walsh Cnty.*, 757 F.3d 734, 738 (8th Cir. 2014)) (quotation marks omitted).  "Unless both of these questions are answered affirmatively, [a defendant] is entitled to qualified immunity."  *Id.* at 523 (quoting *Nord*, 757 F.3d at 738) (quotation marks omitted).

Although "[q]ualified immunity is an affirmative defense for which the defendant carries the burden of proof," the "plaintiff . . . must demonstrate that the law is clearly established."  *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002) (citing *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989)).  "A right is clearly established only where it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).  Although case law directly on point is not necessary to

demonstrate that a right is clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).  The Supreme Court has reiterated in recent decisions that clearly established rights "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)) (quotation marks omitted).  Qualified immunity exists to protect "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 551 (quoting *Mullenix,* 577 U.S. at 12).

### A. Defendants Hughes, Branson, and Arthur have not shown that they are entitled to qualified immunity.

Plaintiff alleges that the Correctional Officer Defendants (i.e., Hughes, Branson, and Arthur) violated Mr. Payton's Fourteenth Amendment Due Process rights by acting with deliberate indifference to his serious medical needs by:  (1) failing to respond to direct information that Payton was having a medical emergency and (2) failing to provide any first aid or CPR after calling for the medical professionals.[6]  Doc. [1] ¶ 73; Doc. [57] at 4, 6.

The Court has already determined that, based on the undeveloped factual record, Defendants have not satisfied the first prong of the qualified immunity analysis.  Doc. [40] at 7.  Defendants argue that they did not violate Mr. Payton's constitutional rights because there was no delay in responding to the emergency or rendering aid, and, in the case of the supervising officers, that they had no personal involvement in the actions that took place on the evening of his death.  Doc. [11-1] at 12-15.  The Court found Defendants' factual showing insufficient to find qualified immunity based on a lack of liability under the Fourteenth Amendment.  Doc. [40] at 7.  In doing so, however, the Court recognized that Defendants had made arguments going to the second prong that purported not to depend on a finding of liability.  *Id.* at 7-8.  Given the imperative to resolve questions of qualified immunity as early as possible and to spare defendants the burden of unwarranted discovery, the Court required Plaintiff to respond to those arguments before commencing discovery.  *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224, 227

---

[6] Because Plaintiff was a pretrial detainee at MSI, Doc. [1] ¶ 1, his "right to medical care arises under the Due Process Clause of the Fourteenth Amendment." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (citing *Vaughn v. Greene Cnty.*, 438 F.3d 845, 850 (8th Cir. 2006)).  Although Plaintiff's claim is rooted in the Fourteenth Amendment, a pretrial detainee is "entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment." *Kitchen v. Miller*, 343 F. Supp. 2d 820, 823 (E.D. Mo. 2004) (quoting *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004)).  Therefore, the Court applies the deliberate indifference standard for an Eighth Amendment violation to Plaintiff's claim.

(1991); *Harlow*, 457 U.S. at 818-19.  Accordingly, the parties have now submitted arguments as to whether, despite not being able to establish an absence of liability, Defendants are nonetheless entitled to qualified immunity because it was not clearly established at the time of the incident that their conduct was a violation of Mr. Payton's constitutional rights.  *See* Docs. [57], [65].

With respect to Defendants' alleged failure to respond, Plaintiff argues that Eighth Circuit case law clearly establishes that an intentional delay in obtaining medical care for an inmate gives rise to a deliberate indifference claim.  Doc. [57] at 4.  For delay to constitute deliberate indifference, "the information available to the prison official must be such that a reasonable person would know that the inmate requires medical attention, or the prison official's actions (or inaction) must be so dangerous to the health or safety of the inmate that the official can be presumed to have knowledge of a risk to the inmate."  *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2011).[7]

To show that Mr. Payton's rights were clearly established under the circumstances presented here, Plaintiff analogizes the facts of this case to those of *Plemmons v. Roberts*, 439 F.3d 818 (8th Cir. 2006).  Doc. [57] at 4.  In *Plemmons*, the plaintiff alleged that he informed a booking officer that he was a heart patient, and six hours later, began experiencing heart attack symptoms, including arm and chest pain, profuse sweating, and nausea.  *Plemmons*, 439 F.3d at 824.  The plaintiff further alleged that the jailers were aware of his need for medical attention, as his cellmate called the jailers to seek help, but no one answered.  *Id.*  When the jailers did arrive, the plaintiff alleged that his symptoms were dismissed as those of an anxiety attack.  *Id.*  The plaintiff then alleged that, twenty-five minutes later, two jailers returned, and, at that time, the plaintiff requested an ambulance, as he believed he was having a heart attack.  *Id.*  Despite that, the jailers did not call an ambulance for another ten to fifteen minutes.  *Id.*  On those facts, the Eighth Circuit determined that "any reasonable officer would have known a delay in providing prompt, appropriate medical care to [the plaintiff]" constituted deliberate indifference in violation of the plaintiff's constitutional rights.  *Id.* at 825.  Plaintiff argues that the same logic applies here:  A reasonable correctional officer or lieutenant would have known that failing to

---

[7] A deliberate indifference claim also requires that the inmate actually suffered from an objectively serious medical need.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Defendants do not dispute that Plaintiff suffered from an objectively serious medical need.  *See* Doc. [65] at 6 n.2.  Their argument focuses on whether they were aware of and disregarded Plaintiff's serious medical need.  *See id.*

respond for over four and a half minutes after Plaintiff lost consciousness, despite the commotion and the detainees' attempts to alert Defendants to Mr. Payton's medical needs, constitutes deliberate indifference in violation of the Fourteenth Amendment.  Doc. [57] at 5.

Defendants argue that *Plemmons* is sufficiently factually distinct from this case that it could not have put them on sufficient notice that their actions violated Mr. Payton's clearly established rights.  Doc. [65] at 6.  In particular, Defendants note that, in *Plemmons*, the plaintiff told the defendants twice that he was experiencing significant chest pain, and the defendants ultimately waited a total of 50 minutes before calling an ambulance.  *Id.* at 5; *Plemmons*, 349 F.3d at 821, 825.  Here, by contrast, Plaintiff does not allege that Defendants were aware of the commotion in the common room nor that they heard the yelling for help.  Doc. [65] at 6.  To find that Defendants were put on notice by *Plemmons*, they argue, would be to define Plaintiff's constitutional right at a "high level of generality," which the Supreme Court has admonished courts to avoid.  *Id.*; *see White*, 137 S. Ct. at 552; *Ashcroft*, 563 U.S. at 742.

Construing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, Plaintiff has established that Mr. Payton's right to prompt attention by Defendants was clearly established under *Plemmons*.  Defendants' argument that Plaintiff has failed to allege that Defendants heard the yelling or commotion is unavailing, as Plaintiff has alleged facts that support an inference that Defendants knew of Mr. Payton's need for attention.  Plaintiff alleges that the other inmates "desperately attempted to verbally alert the guards to the emergency," including yelling that there was a man in the room dying.  Doc. [1] ¶¶ 28, 29.  She further alleges that, in addition to the yelling, two officers walked past the window of the room where the commotion was and neither entered the room.  *Id.* ¶ 27.  The Court has already found that Defendants have not defeated those allegations as a matter of law, finding that the "significant gaps in the sleeping room surveillance video preclude the Court from determining whether [inmate Weddle's notification] was the first time they were notified of Mr. Payton's difficulties."  Doc. [40] at 4.  And Plaintiff has not had an opportunity to conduct discovery to develop further support for her well-pled allegations.  Thus, the Court cannot find an absence of genuine dispute of material fact as to what Defendants knew and when.

Assuming Defendants were aware of Plaintiff's need for help and that they delayed responding for roughly four and a half minutes, *Plemmons* sufficiently places Defendants on notice that such conduct would constitute deliberate indifference.  Defendants' attempts to

differentiate *Plemmons* from the facts of this case are unsuccessful.  While the officers in *Plemmons* waited longer before responding than Defendants in this case allegedly waited, they were also responding to an apparently less urgent medical need than the officers here were.  *See Tlamka*, 244 F.3d at 635 ("[T]he determination of whether [a] delay is constitutionally actionable depends on the seriousness of an inmate's medical condition and on the reason for the delay . . . .").  Plaintiff alleges that Mr. Payton was "completely unresponsive," and that his body was slumped over, with his head rolled back.  Doc. [1] ¶ 23.  Evidence adduced by Defendant supports the allegations of his unresponsiveness.  *See, e.g.*, Doc. [26] at 1, 5, 7, 9; *see also* Doc. [12-1] ¶ 12.  Mr. Payton's unconsciousness allegedly caused the group of detainees to become frantic, as several attempted to revive him and shouted to get the attention of Defendants.  *Id.* ¶¶ 25, 29.  The facts, both as alleged and as so far substantiated by Defendants, suggest that Mr. Payton's condition was plainly dire.  By contrast, although the plaintiff in *Plemmons* complained multiple times of symptoms, he was apparently responsive throughout the episode, and the officers at one point attributed his complaints to anxiety.  *Plemmons*, 439 F.3d at 824.  The circumstances in *Plemmons* were not as severe as those alleged in this case, and still they were found sufficient for a finding of deliberate indifference.  Accordingly, it would have put a reasonable officer in the Defendants' situation on notice that failure to respond with due haste to an inmate in comparatively severe medical distress would constitute deliberate indifference.  *Cf. Tlamka*, 244 F.3d at 633 (given the "obvious and serious nature" of an inmate's medical needs, a 10-minute delay in providing medical care evinced deliberate indifference).

Defendants are correct that the Supreme Court has cautioned that clearly established rights "should not be defined at a high level of generality."  *White*, 137 S. Ct. at 552 (quoting *Ashcroft*, 563 U.S. at 742) (quotation marks omitted).  But the Supreme Court has also held that case law directly on point is not necessary to find that a right is clearly established.  *Id.*  The Eighth Circuit has placed it beyond debate that when an officer is aware of an inmate's serious medical need and fails to respond to that need in a timely manner under the circumstances presented, that failure constitutes deliberate indifference proscribed by the Eighth and Fourteenth Amendments.  Viewing the allegations in the light most favorable to Plaintiff, "any reasonable officer would have known" that failing to respond to Mr. Payton's urgent medical need for four and a half minutes, "with no good or apparent explanation for the delay," would have violated his Fourteenth Amendment rights.  *Plemmons*, 439 F.3d at 825 (quoting *Tlamka*, 244 F.3d at

635).  Therefore, viewing the immature record in the light most favorable to Plaintiff, Defendants are not entitled to qualified immunity against Plaintiff's "failure to respond" claim.

In addition to the failure to respond claim, Plaintiff further argues that Defendants may also be held liable for deliberate indifference because of their failure to render medical aid to Mr. Payton upon arriving in Dorm B.  Doc. [57] at 6.  Specifically, Plaintiff claims that Defendants' failure to approach Mr. Payton, check his pulse, or provide CPR between the time that they arrived at the scene and the time that the medical professionals arrived constitutes deliberate indifference.  Defendants argue that case law does not clearly establish that calling the on-site medical professionals instead of personally rendering aid constitutes deliberate indifference under the circumstances presented.[8]  Doc. [65] at 10-12.

Interestingly, both parties rely on the same case—*Tlamka v. Serrell,* 244 F.3d 628 (8th Cir. 2001)—to support their positions.  In that case, Mr. Tlamka, an inmate, suffered a heart attack and collapsed in the prison yard, and another inmate immediately ran to alert a corrections officer that Tlamka was having a heart attack.  *Id.* at 630.  Two other inmates began performing CPR on Tlamka and began to see positive results.  *Id.* at 630-31.  Tlamka regained a more normal color, his eyes opened, and he appeared to begin to catch his breath on his own.  *Id.* at 631.  According to the other inmates, the corrections officers arrived at the scene and ordered them to stop administering CPR to Tlamka.  *Id.*  Although the inmates argued with the officers that it was imperative that CPR be continued, they reluctantly stopped providing aid to Tlamka. *Id.*  The inmates further alleged that, after their aid ceased, none of the officers approached Tlamka or continued the CPR.  *Id.*  Sometime later, other corrections officers arrived with a

---

[8] Defendants argue that precedent from this circuit has held that a police officer is not liable under § 1983 for failing to render first aid or CPR where he or she summoned the necessary medical help instead. Docs. [11-1] at 8-11, [65] at 12-14; *see Teasley v. Forler*, 548 F. Supp. 2d 694 (E.D. Mo. 2008); *Tagstrom v. Enockson*, 857 F.2d 502 (8th Cir. 1988); *Goza v. City of Ellisville*, 2015 US Dist. LEXIS 108618 (E.D. Mo. Aug. 18, 2015); *Powell v. Shelton*, No. 4:17-cv-2017-HEA (E.D. Mo. June 7, 2020). Plaintiff argues that the Eighth Circuit has established different precedent for liability for police officers working outside of correctional facilities and liability for correctional officers. Doc. [57] at 8.  The cases cited by Defendants are based upon Supreme Court precedent holding that the Fourteenth Amendment requires that police "provide medical care to persons who . . . have been injured while being apprehended by the police." *Teasley*, 548 F. Supp. 2d at 709 (quotation marks omitted) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).  Given that the Supreme Court has instructed courts that a qualified immunity analysis "must be undertaken in light of the specific context of the case," *Brosseau*, 543 U.S. at 199, the Court analyzes the allegations here under the standards that the Eighth Circuit has applied to correctional officers. *See, e.g., Tlamka*, 244 F.3d at 623-33; *Plemmons* 439 F.3d at 823; *Ruark v. Drury*, 21 F.3d 213, 216 (8th Cir. 1994).

gurney and transported Tlamka to the turnkey area, where a prison nurse rendered aid and CPR was once again performed.  *Id.*  Construing the record in the light most favorable to the plaintiff, the Eighth Circuit found that the alleged 10-minute gap between when the inmates ceased CPR and when Tlamka was treated by the nurse could support an Eighth Amendment claim for deliberate indifference.  *Id.* at 634.

Plaintiff argues that *Tlamka* clearly establishes that Defendants' alleged failure to provide prompt medical assistance to Mr. Payton constitutes deliberate indifference, and therefore they are not entitled to qualified immunity at this stage.  *See* Doc. [57] at 6.  The Court agrees.  It is true that the factual circumstances in *Tlamka* were not identical to those in this case.  Among other facts that the Eighth Circuit noted were:  that the period of alleged inactivity by officers on the scene was up to 10 minutes; that Tlamka had been responding favorably to CPR administered by fellow inmates; that the officers in *Tlamka* made inmates stop administering CPR; and that an inmate told the officers that continuing CPR was essential.  *Id.* at 633.  Here, there is no allegation that Defendants made the other detainees completely stop rendering aid, although Plaintiff does allege that the officers "attempted to move the detainees away from Mr. Payton." Doc. [1] ¶ 33.  Also, the alleged time period when four officers "stood by . . . and watched the remaining detainees try to revive Mr. Payton with ice" was "four additional minutes"—i.e., after officers entered the room, which was allegedly already "four minutes and 40 seconds after Mr. Payton lost consciousness."  Doc. [1] ¶¶ 31, 34.  However, given the *Tlamka* court's reliance on the "the patent nature of Tlamka's condition, considering the corrections officers' ability to provide CPR," 244 F.3d at 633, those differences alone would not prevent *Tlamka* from providing notice to reasonable officers in Defendants' position that they had a duty to provide emergency medical assistance to Mr. Payton under the alleged circumstances of this case.  *See Rivas-Villegas*, 142 S. Ct. at 7 (quoting *White*, 137 S. Ct. at 551).

Defendants attempt to draw other distinctions between this case and *Tlamka*, arguing that they "did not know what was wrong with Payton, did not know Payton had stopped breathing, did not know if Payton had a pulse, and did not know that he needed CPR or that CPR would be helpful as opposed to harmful."  Doc. [65] at 10.  But Defendants themselves have produced evidence that Mr. Payton's lips were purple, that he was unconscious, that other inmates were trying to revive him with ice, and that they had been told that he was not breathing.  Doc. [26] at 1, 5, 7, 9; *see also* Doc. [12-1] ¶ 12 (Defendant Branson's attestation that inmate Brandon

Weddle reported to him "Ya'll [*sic*] need to get in here . . . it's a dude passed out and he looks like he's going to die."). Defendants acknowledge that, "when medical staff arrived, they began to administer CPR." Doc. [12-3] ¶ 21. And while each individual Defendant's sworn affidavit does attest that he is "not a trained medical professional," Doc. [12-1] ¶ 27, [12-2] ¶ 27, [12-3] ¶ 26, none denies that he had been trained in CPR and first aid. *See* Doc. [1] ¶ 67. Nor does Defendant Hughes deny Plaintiff's specific allegation that he had "received specific training on how to recognize signs and symptoms of an overdose and how to provide emergency aid." *Id.* ¶ 68. As this Court already held, the factual record is insufficient to demonstrate an absence of genuine dispute of material fact as to such questions. *See* Doc. [40] at 4. To the extent that Defendants' claim to qualified immunity also depends on the finding of such facts in their favor, it also fails.

Defendants also place great significance on the fact, sworn to in their affidavits and corroborated by the surveillance video evidence, that they called for medical assistance from on-site medical providers immediately upon entering the room. They argue that "the permanent presence of on-site medical assistance reasonably expected to immediately respond to inmate housing units" relieves them of any obligation to render interim medical are. Doc. [11] at 11-20. That argument assumes too much. First, it assumes that Defendants' expectation that on-site medical professionals would respond "immediately" to the medical situation was "reasonable," which is a claim that Plaintiff is entitled to test via the discovery process before Defendants are entitled to rely on it to justify summary judgment. And second, it assumes that the existence of such on-site care would make a "dispositive" difference in failure to provide medical care cases. Doc. [65] at 11. Defendants cite no authority for the proposition that the mere existence of on-site medical staff relieves correctional officers of the constitutional obligation to render emergency care to an inmate in physical distress. The *Tlamka* decision places no apparent significance on where the medical assistance that ultimately arrived came from. *See Tlamka*, 244 F.3d at 631. In fact, that opinion notes that the plaintiff eventually received care from a "prison nurse," who was "waiting to render aid" in an area "approximately 50 feet from where he had collapsed." *Id.* That fact did not prevent the Eighth Circuit from finding that the officers' alleged failure to render emergency medical care before the nurse arrived could amount to a violation of Tlamka's constitutional rights. *Id.* at 634. Therefore, this Court is not persuaded by

11

Defendants' unsupported argument that the existence of on-site medical professionals should be dispositive here.

The burden is on Plaintiff to show that the allegedly violated right is "clearly established" by pointing to precedent.  Plaintiff has done so here, and Defendants' attempts to distinguish this case from *Tlamka* are unavailing.  Viewing the sparse record in the light most favorable to Plaintiff and giving her the benefit of every reasonable inference, the Court finds that she has made a sufficient showing that a reasonable officer in Defendants' position would have been on notice that the failure to render medical aid to Mr. Payton was a violation of his rights under the Eighth and Fourteenth Amendments.

**B.  Defendants Glass and Carson are entitled to qualified immunity.**

Plaintiff also alleges that Defendants Commissioner Glass and Superintendent Carson acted with deliberate indifference in violation of the Fourteenth Amendment by "set[ting] a policy that correctional officers were not allowed to carry naxolone or other opioid antagonists." Doc. [57] (citing Doc. [1] ¶ 76).  Plaintiff argues that such a policy is deliberately indifferent to Mr. Payton's medical needs in that it requires that officers wait for medical staff or other emergency help to respond to the scene when an inmate is overdosing.  *See id.*

"A supervisor may not be held liable for a deliberate indifference claim under § 1983 for the constitutional violations of a subordinate on a *respondeat superior* theory." *Tlamka*, 244 F.3d at 635 (citing *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)).  A supervisor can, however, be held liable if he or she "created a policy or custom under which the constitutional violation occurred." *Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 913 (E.D. Mo. 2020) (quoting *B.J.G. ex. rel. McCray v. St. Charles Cnty. Sheriff*, 2010 WL 1838414, at *3 (E.D. Mo. May 6, 2010)) (aff'd *B.J.G. ex. rel. McCray v. St. Charles Cnty. Sheriff*, 400 F. App'x 127 (8th Cir. 2010)).  Liability for a policy or custom "attaches in two situations, where a municipal policy is itself unconstitutional, and where the municipality's deliberate indifference to the need to train and supervise its employees caused an employee to violate a third party's constitutional rights." *A.H. v. St. Louis Ctny. Missouri*, 891 F.3d 721, 728 (8th Cir. 2018) (citing *City of Canton v. Harris*, 489 U.S. 378, 386-90 (1989)).

Plaintiff argues that Defendants Glass and Carson may be held liable under the first situation, by allegedly setting the policy that correctional officers could not carry opioid antagonists.  Doc. [65] at 15.  But Plaintiff has not carried her burden to demonstrate that such a

12

policy is unconstitutional under the Eighth and Fourteenth Amendments.  Plaintiff describes Defendants Glass's and Carson's personal involvement in creating and applying the policy that did not permit the correctional officers to carry naloxone or other opioid antagonists and asserts that they knew of the risks associated with delays in care during an opioid overdose.  Doc. [57] at 11, 13; Doc. [1] ¶ 77.  But even assuming that is true, Plaintiff has not presented any authority clearly establishing that the failure of municipality supervisors to equip correctional officers with opioid antagonists constitutes deliberate indifference.

Plaintiff cites *Bonner v. Outlaw*, 552 F.3d 673, 676 (8th Cir. 2009), to show that the Eighth Circuit has permitted supervisor liability where supervisors created a policy under which prisoners were not notified that their incoming mail had been returned.  *Id.*  But, relevant to the facts of that case, the Supreme Court already determined in *Procunier v. Martinez*, 416 U.S. 396 (1974), that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment . . . ."  *Bonner*, 552 F.3d at 676 (quoting *Procunier*, 416 U.S. at 417).  Thus, the policy in *Bonner* that failed to provide notice of incoming mail to inmates violated their constitutional rights.  *Id.* at 679.  Here, Plaintiff's only support for her argument that a policy prohibiting the officers from carrying opioid antagonists violates the Constitution is the general proposition that intentional delay in providing medical care to inmates violates the Constitution.  Doc. [57] at 12 (citing *Plemmons*, 439 F.3d at 825).

Plaintiff bears the burden of demonstrating that Mr. Payton's rights were clearly established.  *Sparr*, 306 F.3d at 593.  To support her theory of liability, then, Plaintiff must point to precedent that would make it clear to every reasonable officer in Glass and Carson's positions that the failure to provide inmates with immediate access to opioid antagonists in the event of an overdose constitutes deliberate indifference.  *See Rivas-Villegas*, 142 S. Ct. at 7.  Precedent establishing that correctional officers cannot intentionally delay providing medical treatment does not provide sufficient notice that a policy of not providing naloxone would violate Plaintiff's constitutional rights.  Therefore, Defendants Glass and Carson are entitled to qualified immunity as to Count I.

## II.   <u>Defendant City of St. Louis is entitled to sovereign immunity on Count III.</u>

Defendants argue that the City is entitled to summary judgment as to Count III on the basis of sovereign immunity.  Doc. [11-1] at 17-21.  Under Missouri law, the City is entitled to

sovereign immunity from tort claims "unless the General Assembly has waived such immunity." *Phelps v. City of Kansas City*, 371 S.W.3d 909, 912 (Mo. Ct. App. 2012) (quoting *Kraus v. Hy-Vee, Inc.*, 147 S.W.3d 907, 914 (Mo. Ct. App. 2004)); Mo. Rev. Stat. § 537.600.  In addition to express waivers, the City can waive sovereign immunity if the governing body either:  (1) "purchase[s] liability insurance for tort claims" or (2) "duly adopts" a "self-insurance plan[.]" Mo. Rev. Stat. § 537.610.  Waivers of sovereign immunity are construed narrowly, and "the extent of the waiver is expressly dictated, and limited, by the terms of the insurance policy." *Hendrix v. City of St. Louis*, 636 S.W.3d 889, 900 (Mo. Ct. App. 2021) (quoting *Topps v. City of Country Club Hills*, 272 S.W.3d 409, 415 (Mo. Ct. App. 2008)).  "The plaintiff shoulders the burden of proving the existence of an insurance policy and that the terms of the policy cover the plaintiff's claim." *Id.* (citing *Topps*, 272 S.W.3d at 415; *Brennan By & Through Brennan v. Curators of the Univ. of Missouri*, 942 S.W.2d 432, 436-37 (Mo. Ct. App. 1997)).

In her Complaint, Plaintiff alleges that the City obtained insurance, or in the alternative self-insurance, through the Public Facilities Protection Corporation (PFPC), which is funded in part by an annual payment from the City.  Doc. [1] ¶ 133.  The funds in the PFPC, according to Plaintiff, are used to pay "any and all claims against the City, including claims against City correctional officers" for the types of violations that she alleges in this suit.  *Id.*  The City, on the other hand, denies that it obtained any insurance plan that covers the conduct alleged here or that it is self-insured, and insists that sovereign immunity therefore bars Plaintiff's claims against it. Doc. [11-1] at 19; Doc. [62] at 1.  Defendants submit an affidavit from the Register of St. Louis City—the officer charged with custody of all city contracts—verifying that no such contract or ordinance exists.  *See* Doc. [12-13] ¶ 8.  In its previous Memorandum and Order, the Court determined that that showing was sufficient to demonstrate an absence of genuine dispute of material fact, satisfying the initial threshold for summary judgment, and thus, the Court ordered Plaintiff to respond to Defendants' Motion as to Count III against the City.  Doc. [40] at 9-10.

### A. Plaintiff has not demonstrated the existence of a genuine issue of material fact as to whether the City purchased liability insurance.

The City, in the form of an affidavit of Dionne M. Flowers—the Register of the City of St. Louis—maintains that it "has not purchased any liability insurance policy to cover torts personal injuries, or any other claims that do not arise from dangerous property conditions or the operation of motor vehicles."  Doc. [58] ¶ 25 (citing Doc. [12-13]).  In support of her argument,

Plaintiff denies the City's assertion, citing ¶¶ 26-44 of her Statement of Additional Material Facts as evidence.[9]  *Id.*  With respect to the purchase of liability insurance, Plaintiff points to an affidavit of Karen Jackson—the Clerk Coordinator for the City of St. Louis who reports to Ms. Flowers—which was submitted by the City in a response to a Court order in *Cody v. City of St. Louis*, No. 4:17-cv-2707-AGF (E.D. Mo. Aug. 28, 2020).  There, just a few days after the Flowers affidavit was submitted in this case, Ms. Jackson submitted that "not all departments and divisions within the City of St. Louis provide copies of all their contracts to the City of St. Louis Register[.]"  Doc. [58-1] ¶ 6.  Therefore, Ms. Jackson noted that she could not "attest with certainty" whether certain liability insurance contracts existed.  *Id.*

Plaintiff argues that, in light of Ms. Jackson's affidavit, the "City's citation to Ms. Flowers' affidavit does nothing to settle the question of whether the City has purchased liability insurance . . . ."  Doc. [57] 14.  The Court disagrees.  The Court already determined in its previous Order that the City met its initial burden on summary judgment to submit evidence "demonstrat[ing] the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  The evidence introduced in response (i.e., Ms. Jackson's affidavit) does not sufficiently controvert the evidence adduced by the City.  To meet its burden at this stage, Plaintiff must "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'"  *Farver*, 931 F.3d at 811 (quoting *Wingate*, 528 F.3d at 1079).  Viewing the evidence in the light most favorable to Plaintiff, Ms. Jackson's affidavit does not provide any specific evidence demonstrating that the City purchased liability insurance covering Plaintiff's claims.  And where the evidence is merely colorable, as it is here, summary judgment is appropriately granted.  *Anderson*, 477 U.S. at 247-48.

**B.  The PFPC is not a self-insurance plan as a matter of law and thus cannot be a basis of the City's waiver of sovereign immunity.**

Plaintiff's second argument in support of a waiver of sovereign immunity is that, even if the City did not purchase liability insurance, it obtained self-insurance via the PFPC.  Under Mo.

---

[9] The Court agrees with Defendant that Plaintiff failed to comply with Local Rue 4.01(E) by failing to deny Defendant's ¶ 25 "with specific citation to the record, upon which [Plaintiff] relies."  E.D. Mo. L.R. 4.01(E); Doc. [62] at 2.  In the interest of adjudicating the merits of Plaintiff's argument, which can be deciphered from her Statement of Additional Facts and Memorandum in Opposition, the Court will not deem ¶ 25 admitted, but Plaintiff is admonished to take greater care to comply with the Court's Local Rules in the future.

Rev. Stat. § 537.610.1, sovereign immunity is waived only "in such amount and for such purposes provided in any self-insurance plan duly adopted by the governing body" of the City of St. Louis. The City contends that its governing body is the Board of Alderman, which "duly adopts" measures by ordinance.[10] Doc. [62] at 2. To show that the City waived sovereign immunity by the adoption of a self-insurance plan, Defendant argues, Plaintiff must point to an ordinance adopted by the Board of Alderman that explicitly authorizes a self-insurance plan covering Plaintiff's claims. Doc. [62] at 2-3. The City again points to Ms. Flowers's affidavit stating that she "has no record of any City ordinance duly enacted by the City's Board of Alderman that purports to adopt a plan of self-insurance providing liability coverage for the City for tort claims other than those arising from motor vehicle accidents with vehicles operated by City employees and claims arising from the dangerous condition of public property," including any such records relating to the PFPC. Doc. [12-13] ¶¶ 6, 7.

Plaintiff points to no ordinance passed by the Board of Alderman adopting a self-insurance plan that covers her claims. Instead, Plaintiff argues that the PFPC is itself a self-insurance plan, Doc. [57] at 15, and that the City has adopted it, albeit not by ordinance. She urges the Court, in the absence of a statutory definition of "self-insurance plan," to define the term according to Black's Law Dictionary: "[a] plan under which a business maintains its own special fund to cover any loss[.]" *Id.* at 16; Self-Insurance Definition, *Black's Law Dictionary* (11th ed. 2019). In support of her claim that the PFPC meets this definition, Plaintiff submits several of the PFPC's founding documents, including its Articles of Incorporation, Doc. [58-2], bylaws, Doc. [58-3], and a 1987 resolution of the City's Board of Estimate and Apportionment, Doc. [58-4], which suggest that the PFPC's purpose at its inception was to insure the city against all claims for damages.

Plaintiff also submits evidence purporting to show that the City has routinely acknowledged its use of the PFPC to cover litigation exposure and has frequently paid claims similar to Plaintiff's using the PFPC funds. *See* Docs. [58-5]–[58-16]. Plaintiff's evidence includes: municipal bond issues from 2016 and 2018 stating that "when no independent

---

[10] The Court agrees with Defendant that the Board of Alderman, as a matter of law, is the governing body of the City of St. Louis. Doc. [62] at 5 (citing *Chicago, B. & Q. R. Co. v. North Kansas* City, 367 S.W.2d 561, 567 (Mo. banc. 1963)). Plaintiff does not dispute that the Board of Alderman exercises its authority by ordinance; Instead, she argues that the City may adopt a self-insurance plan in ways other than by ordinance by the Board of Alderman. *See* Doc. [57] at 20.

insurance coverage exists, payments of settlements and judgment are administered by the PFPC, the city's self-insurance plan," and that the City's "Law Department prepares vouchers from such payments which are submitted to the Comptroller's Office and drawn on PFPC's account," Doc. [60] ¶¶ 31, 32 (citing Docs. [58-5] – [58-7]); two statements from Defendants' Tax and Revenue Anticipation Notes Payable from the General Revenue Fund in 2015 and 2016 describing two cases in which the City admitted using or their plan to use PFPC to pay for claims similar to Plaintiff's, *id.* ¶¶ 33, 34 (citing Docs. [58-8], [58-9]); a declaration of Javad Khazaeli, a licensed attorney in Missouri, stating that, in his experience, settlements of the City are paid via check from an account titled "Treasurer of the City of St. Louis PFCP, *id.* ¶ 35 (citing Doc. [58-10]); the City's 2017 Comprehensive Annual Financial Reports which notes that the PFPC's "sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters," *id.* ¶ 36 (citing Docs. [58-11] at 50, [58-12] at 52); a letter from the City Counselor to Alderwoman Megan E. Green, stating that the PFPC "insure[s] the City against all claims," and that the PFPC may be "properly thought to be self-insurance," *id.* ¶ 37 (citing Doc. [58-13] at 3-4); that the City pays a premium to the PFPC; *id.* ¶¶ 38, 39 (citing Docs. [58-13] at 2, [58-14] at 32); the City's 2019 Annual Operating Report, which defines the PFPC as providing "general protection from judgments rendered against the City," *id.* ¶ 40 (citing Doc. [58-14] at 32); the City's website stating that the PFPC is the City's self-insurance program, *id.* ¶ 41 (citing Doc. [58-15]); and, finally, the statements of City Budget Director Paul Payne noting that the PFPC is the City's self-insurance fund, and that the City budgets for judgments against them by their contributions to the fund, *id.* ¶ 42 (citing Doc. [58-16] at 6).

Plaintiff asks this Court to decide whether the City's relationship with the PFCP, whereby funds paid by the City to PFPC are allegedly used to pay tort judgments against the City and its employees, constitutes a "duly adopted" self-insurance plan sufficient to effect a waiver of sovereign immunity under Mo. Rev. Stat. § 537.610.1.  This Court has repeatedly found similar allegations sufficient to survive motions to dismiss.  *Morgan-Tyra v. City of St. Louis*, 2019 WL 5597094, at *8 (E.D. Mo. Oct. 30, 2019) (citing *Aldridge v. City of St. Louis, Missouri*, 2019 WL 1695982, at *13 (E.D. Mo. Apr. 17, 2019); *Fortenberry v. City of St. Louis*, 2019 WL 1242671, at *7 (E.D. Mo. Mar. 18, 2019)) ("The [Court] agrees with the other judges in this District who have held that similar allegations of PFPC insurance or self-insurance are sufficient at this stage

to plead an exception to sovereign immunity under § 537.610.1.").  But the issue is now before the Court on summary judgment.  Therefore, the Court must determine whether Plaintiff has adduced sufficient evidence for the Court to find, as a matter of law, that the City's relationship with the PFPC effects a waiver of its sovereign immunity as to Plaintiff's claim.  *See Kreutz v. Curators of Univ. of Missouri.*, 363 S.W.3d 61, 63-64 (Mo. Ct. App. 2011) ("Whether sovereign immunity applies to a defendant is . . . a question of law.").

Previously, this Court has declined to answer this question in the interest of comity, as Missouri appellate courts had "not addressed this issue nor [had] they interpreted the relevant statutes as they relate to the City's participation in the PFPC program."  *Laney v. City of St. Louis*, 2021 WL 4439252, at * 11 (E.D. Mo. Sept. 28, 2021) (appeal pending) (declining to exercise supplemental jurisdiction over state law claims where the issue was one of first impression under Missouri law).  On November 9, 2021, however, the Missouri Court of Appeals addressed the issue in *Hendrix v. City of St. Louis*, 636 S.W.3d at 899-901.[11]

Ms. Hendrix made the same argument as Ms. Washington:  "[T]he city waived sovereign immunity by duly adopting self-insurance or liability insurance through the PFPC."  *Id.* at 889.  The City submitted affidavits stating that it had not purchased liability insurance to cover torts, personal injuries, or any other clams that do not arise from either dangerous property conditions or the operation of motor vehicles, nor did it have any record of any contract entered between the City and the PFPC or an ordinance duly enacted by the Board of Alderman to adopt a self-insurance plan providing liability coverage for the plaintiff's claims.  *Id.* at 900-01.  In response, the plaintiff produced "the PFPC's articles of incorporation, its bylaws,  a document entitled 'City of St. Louis Risk Management Program,' a screenshot from the City's website referring to the PFPC as 'the city's self-insurance program,' and a letter from City Counselor Julian Bush to a City Alderwoman, stating that the PFPC's purpose is to 'insure the City against all claims' and that it can 'be properly thought to be self-insurance.'"  *Id.* at 901.

On that record, the Missouri Court of Appeals determined that the plaintiff had not produced sufficient evidence to overcome the City's showing supporting summary judgment on the basis of sovereign immunity.  *Id.*  In particular, the court held that plaintiff did not provide

---

[11] The Missouri Court of Appeals issued its decision in *Hendrix* after the parties' Motion for Summary Judgment was fully briefed, but Defendant filed a Motion for Leave to File Notice of Supplemental Authority addressing the *Hendrix* decision, to which Plaintiff responded.  *See* Docs. [71], [72].

"any evidence . . . showing that the City does have insurance covering her specific claim." *Id.* The court went on to discuss that the City Counselor's letter was not persuasive, as it merely reflected his opinion, and the founding documents "fail to show that the City either has liability insurance or is self-insured" as to Plaintiff's specific claims. *Id.*

The City argues that the evidence presented by Plaintiff here is nearly identical to that adduced by Hendrix, and thus, the Court should—indeed, must—conclude that such evidence is insufficient to defeat summary judgment. Doc. [71] at 2-3. Plaintiff argues that the City overstates the holding in *Hendrix*, in that it did not find that the PFPC is not a program of self-insurance as a matter of law. Doc. [74] at 2. Rather, the holding merely stated that the plaintiff failed to produce sufficient evidence to defeat summary judgment. *Id.* Unlike the plaintiff in *Hendrix* who submitted five exhibits, Plaintiff submitted 18. *See* Docs. [58-1]–[58-18]. And Plaintiff notes that, unlike in *Hendrix*, she has submitted evidence that controverts the Flowers affidavit by submitting Ms. Jackson's affidavit in *Cody v. City of St. Louis*, Doc. [58] ¶ 26, which proves that the PFPC has been regularly used to pay tort claim judgments like hers, *id.* ¶¶ 33-35.

In addition to disputing the scope of the *Hendrix* decision, the parties dispute to what extent, if at all, the Missouri Court of Appeals's opinion is binding on this Court. *See* Docs. [71] at 2-3; [74] at 3. "The decisions of the Missouri Supreme Court as to state law are binding on this court." *B.B. v. Cont'l Ins. Co.*, 8 F.3d 1288, 1291 (8th Cir. 1993). This Court is bound by the Missouri Supreme Court's "construction of its own law, and even where there is no case directly on point . . . [the Court] look[s] to relevant state precedent, analogous decisions, considered dicta, and any other reliable data to determine how the [Missouri Supreme Court] would construe [the] law. *In re W. Iowa Limestone, Inc.*, 538 F.3d 858, 866 (8th Cir. 2008). And although this Court is not bound by the Missouri Court of Appeals, "state appellate court decisions are highly persuasive and should be followed when they are the best evidence of state law." *Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189, 1196 (8th Cir. 1992).

Viewing the record in the light most favorable to Plaintiff, and in light of the Missouri Court of Appeals's holding in *Hendrix*, the Court concludes that, like Hendrix, Plaintiff here has failed to present sufficient evidence to defeat the City's invocation of sovereign immunity. Although Plaintiff does provide more evidence than Hendrix did, the Missouri Court of Appeals found most significant the lack of "any evidence . . . showing that the City does have insurance covering her specific claim. . . . The City Counselor is not the governing body of St. Louis and

the letter is not evidence that a self-insurance plan was duly adopted by the City's governing body . . . ." *See Hendrix*, 636 S.W.3d at 901. Like the City Counselor's letter and the founding documents, Plaintiff's additional evidence tends to show that the PFPC is either intended to be or has been used as a self-insurance plan. That still provides no affirmative evidence that the governing board of St. Louis City adopted a self-insurance program to cover claims like Ms. Washington's, as required by Mo. Rev. Stat. § 537.610.

The Court reaches this conclusion not only in deference to the *Hendrix* decision as "the best evidence of state law," though it does regard *Hendrix* as such. *Baxter Int'l Inc.*, 976 F.2d at 1196. The Court also agrees with the Missouri Court of Appeals, as a matter of statutory interpretation, that the text of Mo. Rev. Stat. § 537.610 requires a litigant to provide evidence that a governing body "duly adopted" a self-insurance program covering the specific claim. *Id.*; *see also State ex. rel Goldsworthy v. Kanatzar*, 543 S.W.3d 582, 585 (Mo. banc. 2017) ("The primary goal of statutory interpretation is to give effect to legislative intent, which is most clearly evidenced by the plain text of the statute."); *Arkansas Times LP v. Waldrip*, 988 F.3d 453, 463 (8th Cir. 2021), *reh'g en banc granted*, No. 19-1378 (8th Cir. June 10, 2021) (federal courts "are bound by a state's rules of statutory interpretation when reviewing a statute of that state").

Section 537.610 provides that the scope of any waiver of immunity is limited to "such amount and for such purposes provided in any self-insurance plan *duly adopted* by the governing body" of the municipality. Mo. Rev. Stat. § 537.610. Section 537.610 does not define "duly" or "adopted." In Missouri courts, "[a] word not defined in a statute is given its ordinary meaning pursuant to the dictionary." *Gross v. Parson*, 624 S.W.3d 877, 884-85 (Mo. banc. 2021) (quoting *Bus. Aviation, LLC v. Dir. of Revenue,* 579 S.W.3d 212, 218 (Mo. banc 2019)). Webster's Third New International Dictionary (3d ed. 2002)[12] defines "duly" as "in a due manner, time, or degree." And under "adopt," the same dictionary provides that when it used "of a deliberative body," it means "to endorse and assume official responsibility for." *See Gross*, 624 S.W.3d at 885 ("The context in which a word is used determines which of the word's ordinary meanings the legislature intended."). Thus, if something is "duly adopted" by a governing body, that ordinarily means that the governing body endorsed or assumed

---

[12] Missouri courts commonly refer to the Third Edition of Webster's Third New International Dictionary in construing undefined statutory terms. *See, e.g.*, *Gross*, 624 S.W.3d at 886, 887; *Bus. Aviation*, 579 S.W.3d at 218; *Brock v. Dunne*, 637 S.W.3d 22, 30 (Mo. banc. 2021); *Ed Napleton St. Louis Imports, Inc. v. American Honda Motor Co., Inc.*, 638 S.W.3d 534, 540 (Mo. Ct. App. 2021).

responsibility for it in due manner.  Those definitions do not resolve all uncertainty about the application of § 537.610, of course.  Further analysis might be required to determine what constitutes "due" manner, for example.  But none of Plaintiff's evidence about the PFPC's operations and the City's use of it supports a conclusion that the Board of Alderman of the City of St. Louis *endorsed or assumed responsibility for* a self-insurance plan that covers Plaintiff's claim in *any* manner.  Therefore, the Court cannot find a waiver of the City's sovereign immunity.  That conclusion is especially clear given Missouri courts' instructions that such statutory waivers be construed "strictly" and "narrowly."  *Richardson v. State Highway & Transp. Comm'n*, 863 S.W.2d 876, 880 (Mo. banc 1993) (collecting cases); *A.F. v. Hazelwood Sch. Dist.*, 491 S.W.3d 628, 635 (Mo. Ct. App. 2016) (quoting *Topps v. City of Country Club Hills*, 272 S.W.3d 409, 415 (Mo. Ct. App.2008)).

"The plaintiff shoulders the burden of proving the existence of an insurance policy and that the terms of the policy cover the plaintiff's claim." *Id.* (citing *Topps*, 272 S.W.3d at 415).  Because Plaintiff has not carried that burden, sovereign immunity shields the City of St. Louis from Plaintiff's Count III.

### CONCLUSION

For the foregoing reasons, the Correctional Officer Defendants are not entitled to qualified immunity as to Count I for the alleged violations of Plaintiff's Fourteenth Amendment rights, but Defendants Glass and Carson are, and Defendant City of St. Louis is entitled to summary judgment as to Count III on the basis of sovereign immunity.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**  The Motion is denied as to Count I against Defendants Hughes, Brandon, and Arthur; granted as to Count I against Defendants Glass and Carson; and granted as to Count III against Defendant City of St. Louis.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 31st day of March, 2022.

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE